IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

GARY L. TEMPLE,

               Plaintiff,

      vs.

CAROLYN W. COLVIN, Acting
Commissioner of the Social Security
Administration;

               Defendant.

**4:12CV3038**

**MEMORANDUM AND ORDER**

This is an action for judicial review of a final decision of the Commissioner of the Social Security Administration ("the Commissioner"). Plaintiff Gary Temple ("Temple") appeals the Commissioner's decision to deny his application for Supplemental Security Income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.* This court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3).

A previous decision on January 24, 2004, granted Temple SSI benefits. Filing No. 8-2, Social Security Administrative Record ("AR") 35[1]. Temple lost his SSI benefits upon incarceration and subsequently reapplied for benefits. The Administrative Law Judge ("ALJ") denied Temple's first post-prison application, dated October 24, 2005. *Id.* The ALJ also denied Temple's second application on November 26, 2008. *Id.* The Appeals Council affirmed the denial on April 16, 2009. *Id.* The ALJ denied Temple's third application on January 20, 2009. *Id.* Temple received a denial of his request for reconsideration on July 30, 2009. *Id.* On October 10, 2009, Temple filed a request for

---

[1] In the favorable 2004 decision, the ALJ relied on the diagnosis of Dr. Robert Arias, Ph.D., of "generalized social phobia and alcohol dependence in early remission and major depressive disorder, recurrent, in remission; GAF 54," and the ALJ rated the B criteria as "mild-activities of daily living, marked-social functioning, and moderate-concentration." AR 27.

hearing by an ALJ.  AR 103.  The ALJ conducted a hearing on July 14, 2010, and again on March 9, 2011.  AR 115, 162.  The ALJ denied plaintiff's claim on March 21, 2011. AR 6.  Temple requested a review of the decision, and on December 27, 2011, the Appeals Council denied Temple's request.  The ALJ's decision stands as the final decision of the Commissioner.  AR 1.

## I.  BACKGROUND

Temple was born on July 17, 1969, and is currently 43 years of age.  AR 16.  He alleges he became disabled on January 20, 2009, at which time he was 39 years old. AR 9.  He is 5' 9" and weighed one-hundred-eighty pounds at the time of his application. AR 221.  Temple completed ninth grade in school and he never finished his GED.  AR 42.  Temple indicates that he was in special education and that he did not complete high school due to a "lot of partying" and being a slow learner.  AR 637.  He held a steady job in construction when he was younger.  AR 43.  His other work experience includes jobs as a furniture mover, a temporary worker and a warehouse worker.  AR 222.  Temple never earned more than $3,300 in any given year.  AR 43.  He attributes the lack of substantial earnings to his social anxieties.  AR 43.  Temple has not steadily worked since June 30, 2003.  AR 221.  He alleges that he ceased working because he could not concentrate, had panic attacks, and social phobia.  *Id*.

Temple lived with his mother and brother up until January 2011, at which point he became homeless.  AR 39, 46.  Temple was married once, from 2001 to approximately 2002.  AR 40.  He has one son, Brian, age 20, and another son, Patrick, age 10.  AR 637.  He should be paying child support for the minor.  AR 6.  Temple struggled with alcohol problems from his teenage years onward, and alleges to have been sober since

2

2007.  AR 41.  Temple received Supplemental Social Security income previously on January 21, 2004.  AR 27.  In 2004, the ALJ found Temple disabled, relying heavily on the diagnosis of Robert Arias, Ph.D., of "generalized social phobia and alcohol dependence in early remission and major depressive disorder, recurrent, in remission; GAF 54."  *Id.*  Overall, the decision rated the B criteria as: "mild-activities of daily living, marked-social functioning, and moderate-concentration."  *Id.*

Temple currently suffers from Graves' disease and underwent a Thyroidectomy in 2007.  AR 11.  In early April 2007, Temple experienced neck pain, left arm pain, and intermittent chest pain.  AR 297.  On April 13, 2007, Temple went to BryanLGH Medical Center West and a BHI cardiologist ruled out any significant cardiac disease.  *Id.*  Temple's discomfort continued through April 23, 2007, at which point he saw Paul N. Gobbo ("Dr. Gobbo"), M.D.  AR 297.  Dr. Gobbo prescribed Vicoprofen for the pain and recommended a radiograph of the left shoulder and an orthopedic opinion.  AR 298.  Temple saw Benjamine R. Gelber, M.D. ("Dr. Gelber"), on July 25, 2007, for a consultation regarding the ongoing left shoulder and arm pain.  AR 599.  Dr. Gelber recommended a short course of steroids, some physical therapy, and prescribed Decadron.  *Id.*

The treatment did not help, and the Decadron increased Temple's anxiety and nervousness in his Graves' disease; thus, Dr. Gelber discussed the option of an anterior cervical discectomy with Temple.  AR 596.  On August 2, 2007, Temple underwent an "anterior cervical discectomy 6th cervical with removal of an extruded intervertebral disc and anterior interbody arthrodesis with a BAK cervical cage."  AR 593.  Dr. Gelber performed the procedure.  AR 593, 595, 607.  Due to Temple's history of Graves'

3

disease, Temple underwent a thyroidectomy in May 2007, but subsequently experienced some bilateral eye discomfort and pressure.  AR 294.

### A.  Treating Medical Providers for Physical Ailments

During a routine visit on July 15, 2008, for a rash that Temple was experiencing, Dr. Gobbo described Temple as someone with "chronic depression as well as chronic personality disorder."  AR 294.  At that time, Temple took the following medications for his lower back pain and anxiety: Lisinopril HCT, Levothyroxine, Effexor XR, Hydrocodone/APAP, Prilosec, and Bactrim.  *Id.*

Temple went to the emergency department at BryanLGH Medical Center on March 5, 2008, for persistent mid and upper back pain, which he rated at 9 out of 10 in intensity and constant.  AR 388.  He received a prescription of Flexeril to take as needed for muscle spasms.  AR 390.  Approximately two weeks later, on March 21, 2008, Temple returned to the emergency department with neck pain, claiming he received temporary relief from Flexeril, but the pain increased to the point of causing him headaches.  AR 381.  He denied any injury or strenuous activity.  *Id.*

He returned to the emergency department on December 8, 2008, rating his back pain as 10 out of 10, stating that he had been experiencing pain on and off ever since his cervical fusion.  AR 349.  Temple further alleged that he experienced a numbness and tingling sensation when he slept.  *Id.*  The emergency department physician assistant, Todd E.  Feeney, P.A., found Temple to have full range of motion of the neck and the back.  AR 350.  Temple received a prescription for Dolobid and instructions to follow up with Dr. Gobbo.  *Id.*

4

On January 27, 2009, Temple went to the emergency department for severe head and neck pain.  AR 339.  Temple rated his pain as 9 out of 10.  *Id.*  Two days prior to his emergency department visit, Temple had slipped and fallen in the shower.  *Id.*  The treating physician assistant, Susan D.  Creal, P.A., found that Temple had a limited range of motion at the neck and recommended ice and heat for the affected areas.  AR 340.  A head CT image did not identify any abnormalities.  AR 342.

On February, 19, 2009, Temple visited the emergency department for left-sided neck and chest pain.  AR 432.  He alleged strained his neck approximately three weeks ago, and admitted to taking hydrocodone for the pain; however he did not have any more medication.  *Id.*  Temple's EKG, cardiac enzymes, and check x-ray were negative.  AR 433.  The emergency department attending physician gave Temple a prescription for Hydrocodone and released him from the emergency department.  AR 436.  Arif A.  Sattar, M.D., saw Temple on March 2, 2009, for a follow-up appointment in regards to his chronic medical problems, as well as hypothyroidism and hypertension.  AR 674.  Dr. Sattar recommended Temple continue Lisinopril and Hydrochlorothiazide as well as Levothyroxine.  AR 674.

On March 11, 2009, Temple experienced left-sided shoulder and neck pain for two weeks and received a referral to the emergency department.  AR 423.  He alleged that the pain increased with deep breaths, movement, and exercise.  *Id.*  The attending physician at the emergency department noted that Temple's recent lab work showed his triglycerides to be over 800, and he had started cholesterol medication the previous day.  AR 423.  Temple received anti-inflammatory medication, Ultram 50mg and Naprsyn 375mg, to be taken as needed for pain.  AR 426.

On May 6, 2009, Temple saw Jennifer Graham ("Graham"), PAC, at the Public Health Clinic in Lincoln as a follow-up to his emergency department visit on March 11, 2009.  AR 659.  Temple indicated that Ultram did not help him, but that he believed Naprosyn aided in alleviating his pain.  *Id*.  Furthermore, he stated using 5 to 6 Hydrocodone per day to relieve his neck pain.  *Id*.  During the visit Temple stated that he was again experiencing some left-sided chest pain which he attributed to his anxiety.  *Id*.  Graham suggested the discontinuation of the Ultram and prescribed Hyrdocodone as well as a refill for Naprosyn.  *Id*.

Additionally, she set up a cardiology consult in order to rule out any cardiac etiology.  *Id*.  On May 13, 2009, Temple saw Todd J. Tessendorf, M.D. ("Dr. Tessendorf"), at the BryanLGH Heart Institute.  AR 499.  During the visit Temple indicated that he had a heart catheterization approximately two years ago which was normal; however, no records of the heart catheterization could be found.  AR 499-500.  Dr. Tessendorf ordered an echocardiography study, which showed normal heart function.  AR 501.

Temple received a referral to see Robert N. Hibbard, M.D., FACC ("Dr. Hibbard") for a vascular evaluation regarding a burning sensation in his legs.  AR 512.  On June 2, 2009, Dr. Hibbard found Temple to have "fairly typical claudication of his calves and abnormal ankle-brachial indices."  AR 512.  Dr. Hibbard diagnosed Temple with highly symptomatic abnormal exercise ankle-brachial indices.  AR 548.  Dr. Hibbard recommended the use of an angioplasty to relieve the pain.  AR 512-513.  The sonographer conducting the arterial scan noted that the "disease in the aortoiliac vessels presents to at least a moderate severity."  AR 520.  On June 15, 2009, Dr.

6

Hibbard performed an angiograph which showed corrugation through the entire vessel; however, angiographically the study was grossly normal.  AR 542.

On July 16, 2009, Temple saw Graham for continued bilateral lower extremity calf pain and tightness.  *Id.*  He indicated that his legs feel almost numb after he walks for several blocks.  AR 658.  Graham noted a vitiligo-type rash to the bilateral anterior lower extremities; however, the lower extremities were non-edematous and nonerythematous.  *Id.*  During the exam, Graham also noted tenderness to palpitation approximately from C7 through T3, as well as around L1 through L2.  AR 658.  Nonetheless, Temple had a good range of motion throughout the spine.  *Id.*  Graham requested that Temple receive an MRI before proceeding to see Dr. Gelber.  *Id.*

On July 20, 2009, Temple received an MRI, with and without contrast, of the cervical spine, which was compared with a CT scan dated January 29, 2009.  AR 570.  The MRI showed postsurgical changes of interbody fusion with a metallic interference screw at C6-7.  The MRI also revealed a bony neural foraminal narrowing on the left at C6-7, which narrowed the neural foramen and slightly narrowed the exiting nerve root at that level.  AR 570-571.  The MRI showed a right paracentral disc bulge at T7-8.  AR 572.  The L4-5 showed some mild disk desiccation, and a small central inferior posterior annular tear.  AR 574.  The findings also included some mild facet hypertrophy.  *Id.*

Temple experienced continued neck pain and presented to the emergency department on July 28, 2009.  AR 575.  Temple used Hydrocodone and Trazodone to alleviate the pain, but had run out of Hydrocodone which prompted him to come to the emergency department.  *Id.*  Temple felt a burning sensation in the posterior neck and rated his pain 10 out of 10.  *Id.*  The emergency department physician, Tadd A.

Delozier, M.D., described Temple's pain as localized pain over the cervical spine region. AR 576.  However, he found Temple to have a full range of motion.  AR 576.  Dr. Delozier prescribed Hydrocodone and set up an appointment for Temple with Dr. Gelber.  AR 576.

Temple saw Dr. Gelber on August 5, 2009, for continued pain in the base of his neck, with some radiation down the left arm and into the thumb on the left.  AR 587. Temple admitted to gardening and lifting a big screen TV; however, he was unsure if those activities were related to his neck pain.  *Id.*  Dr. Gelber conducted an exam and found Temple to have good strength and symmetrical and equal reflexes.  *Id.*  He also reviewed the MRI from July 20, 2009, and did not find anything of great significance.  *Id.* Dr. Gelber considered the small disc protrusion at T7 to be incidental and not a cause for discomfort.  *Id.*  Overall, he diagnosed a neck strain which required minimal treatment and recommended that Temple continue taking Naprosyn.  *Id.*

On August 31, 2009, Temple saw Graham for chronic back pain, rating his pain as 6-10 out of 10 at all times.  AR 779.  Upon examination Graham determined tenderness to palpitation in the region of T5 through T7.  *Id.*  However, she found a fair amount of range of motion twisting bilaterally.  *Id.*

Bo Bryson, DC, from Trinity Chiropractic, worked with Temple and provided a summary of his findings on September 9, 2009.  AR 740.  The findings indicated that Temple scored a 66/70 on the Bournemouth questionnaire, placing him at a high risk for psycho-social factors of chronicity.  *Id.*  Bryson diagnosed Temple with cervicothoracic dysfunction, cervical degeneration, and lumbago.  *Id.*  Furthermore, Bryson indicated a decrease in Temple's cervical range of motion and found Temple experienced pain at

C7/T1.  *Id.*  Bryson indicated a decrease in Temple's lumbar range of motion which was also painful in flexion.  *Id.*  Additionally, he diagnosed Temple with positive kemps, yeomans and shoulder depression test; as well as a positive Miners sign.  *Id.*

Temple's continued neck pain led him to see Dr. Gelber on September 30, 2009. Upon examination, Dr. Gelber did not find any indications that Temple would benefit from surgery and therefore recommended a continuation of chiropractic care.  AR 703. On February 15, 2010, Dr. Gelber diagnosed Temple with low back pain and muscle spasms.  AR 701.  Dr. Gelber noted tenderness to palpitation in the in the right part of the lumbar paraspinals.  AR 702.  However, Dr. Gelber noted good range of motion in Temple's lumbar spine, indicating that Temple could bend down and touch the floor. AR 702.  Dr. Gelber referred Temple to physical therapy and gave him samples of Amrix.  AR 702.

On February 3, 2010, Temple experienced lower leg pain, and Graham prescribed Acetaminophen-Hydrocodone and recommended that Temple see Dr. Gelber.  AR 758.  On March 22, 2010, Temple saw Graham again for bilateral lower leg pain.  AR 756.  Graham did not find any motor or sensory disturbances.  *Id.*  She prescribed Capasaicin and supplied ACE wraps.  AR 757.  On March 17, 2010, Temple saw Todd Sorensen, P.A., for mid back pain in the thoracic area.  AR 712.  Sorensen noted spasm and tenderness to palpitation in the region of the rhomboids and trapezius. *Id.*  Sorensen recommended physical therapy for the muscle spasm.  AR 712.  On May 20, 2010, Temple reported experiencing dizziness, lightheadedness and right chest pain after short walks.  AR 755.  Graham ordered an EKG which "showed NSR – no inverted t waves or q waves present."  AR 756.

Temple went to the emergency department on June 21, 2010, due to experiencing chest pain and shortness of breath for two weeks. AR 720. The symptoms were intermittent and usually occurred with anxiety. *Id.* He rated his discomfort as 10/10, stating that the pressure inside his chest radiated to his left side of his neck and into his left arm. AR 732. A radiographic examination of the chest did not show any concerns. AR 729. The attending doctor noted that Temple had started taking Chantix the day of the emergency room visit and recommended that he follow up with Dr. Tessendorf in a month. AR 722.

On August 13, 2010, Temple again experienced increased neck and upper back pain. AR 770. An MRI of his cervical spine was taken and compared with a plain film exam of July 13, 2010. *Id.* The image showed a left paracentral disc osteophyte complex which created left neural foraminal narrowing. *Id.* On August 23, 2010, Temple saw Dr. Gelber for ongoing neck, left shoulder, and arm pain. AR 744. Dr. Gelber determined the neck and arm pain might be caused from a possible C7 root irritation and that the left shoulder pain resulted from C6 osteophyte. *Id.* Dr. Gelber did not find further surgery necessary and prescribed physical therapy as well as Naprosyn. *Id.*

By November 18, 2010, Temple's neck pain had increased to a level of 10/10 and he stated the severity of the pain sometimes created difficulty in walking or lying down. AR 751. Upon examination Graham found the cervical spine to show abnormalities and Temple's range of motion to be limited to 45 degrees to the left/right, 30 degrees down, and 20 degrees up. AR 752. Furthermore, she found the C4 and C5 spinous process and the trapezius muscle tender on palpitation. *Id.* Graham

10

prescribed a refill of Naprosyn for the pain and added a prescription of Robaxin for the muscle spasms.  *Id.*

On December 9, 2010, Temple saw Donna Lottman, APRN, in regards to neck and back pain which now prevented him from sleeping.  AR 750.  Temple rated his pain as a 10/10, but stated that the pain decreased to a 7/10 when he took Hydrocodone and Ibuprofen.  *Id.*  Lottman found a small knot in the C3-4 area and some abnormalities in the cervical spine.  AR 751.  The cervical spine showed tenderness on palpitation; C4 spinous process was tender on palpitation and the cervical spine rotation was diminished.  AR 751.  Lottman found Temple able to flex his neck approximately 45 degrees, with a full rotation to the left and an approximate 45 degree rotation to the right.  *Id.*  Lottman prescribed 90 tablets of Hydrocodone 5/500mg to alleviate the pain and recommended that Temple attend physical therapy.  *Id.*

On January 20, 2011, Graham saw Temple again in regards to his chronic neck pain and right shoulder and arm pain.  AR 795-796.  Graham recommended that an MRI of the cervical spine be taken.  AR 796.  An MRI of the cervical spine from January 24, 2011, showed postsurgical changes at C6-7; otherwise no abnormal observations were made.  AR 791.

**B.  Treating Medical Providers for Psychological Ailments**

Ms. Lisa Young ("Young"), MSN, APRN, BC, is Temple's treating psychiatric nurse.  As of January 4, 2008, Young prescribed Temple with Seroquel and Effexor-XP in order to stabilize his mood.  AR 333.  During Temple's routine medication check on August 29, 2008, Young prescribed Invega, because Seroquel gave Temple an upset stomach.  AR 328.  During that appointment, Temple also disclosed that he was fired

from his work because he took a shovel toward another co-worker.   *Id.*   Young attributed this behavior to Temple's mood swings and anger issues.   *Id.*

During a routine medication check on September 25, 2008, Young found Temple to be anxious and depressed.   AR 327.   Furthermore, he had suicidal ideation, anhedonia, decreased motivation, and decreased energy.   *Id.*   Young increased the dosage of Effexor-XR and the dosage for Invega.   On October 16, 2008, Young additionally prescribed Seroquel in order to alleviate Temple's feelings of paranoia.   AR 325.   During a routine visit, on January 23, 2009, Young indicated Temple suffered from social phobia and alcohol abuse.   AR 321.   During a routine visit on March 23, 2009, Young took Temple off Seroquel and instead prescribed Trazodone.   AR 497.   During that appointment, Young found Temple to be doing fairly well, but still having a very hard time being around people.   *Id.*

In November 2008, Temple felt depressed and suicidal on and off; and on November 14, 2008, he spoke with someone at the Community Mental Health Center about his feelings.   AR 317.   Subsequently, a police officer came to his home to do a welfare check.   *Id.*   The police officer then transported Temple to the emergency department at BryanLGH Medical Center.   *Id.*   Temple presented to the emergency department with racing, paranoid thoughts, confusion, and feelings of disorientation.   *Id.* The mental health department admitted Temple for observation and further evaluation. *Id.*  The evaluating physician, Dr. Delozier, found Temple's speech and attention span normal.   AR 312.   However, he found Temple to seem hopeless, have somewhat hypoactive psychomotor activity, and have poor judgment.   AR 312.

A couple months later on March 28, 2009, the Mental Health Center requested that Temple be transferred to the BryanLGH Medical Center mental health unit.  AR 448.  Temple stated he heard voices, and that these voices progressively worsened in the last two months.  *Id.*  Allegedly, the voices told Temple to "stab himself, shoot himself, or jump in front of a car."  *Id.*  Temple admitted to being a recovering alcoholic and to consuming three beers the previous night.  *Id.*  He also admitted to a suicide attempt in 1990.  *Id.*  Temple's mental status examination showed him as being impaired when compared to past reports.  AR 449.  His judgment and insight were limited.  *Id.*  Temple's GAF score[2] upon admission was 30.  AR 446.  Temple stayed overnight at the mental health unit, and the psychotic symptoms had subsided by the next day.  *Id.*  He was discharged with instructions to see Lisa Young at the Community Mental Health Center and to continue taking Trazodone 100 milligrams at bedtime, Effexor XR 150 milligrams per day, Lisinopril, Levothyroxine, Hydrocodone, and Lopid.  AR 446.  Temple's estimated GAF at the time of discharge was 50.  AR 467, 420.

On August 18, 2009, police took Temple to the emergency department after he had apparently attempted to commit suicide by cutting his left wrist.  AR 629.  The Bryan LGH Medical Center admitted Temple for suicidal threats, auditory hallucinations, and hearing voices telling him to kill himself.  AR 618.  Temple also presented with superficial cuts on his forearm.  AR 618.  Upon examination, Temple stated that his

---

[2] The Global Assessment of Functioning ("GAF") Scale is a rating system for reporting the clinician's judgment of the individual's overall level of functioning.  *American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision 34 (4th ed., text revision 2000) (DSM-IV-TR).  Global assessment functioning is the clinician's judgment of the individuals overall level of functioning, not including impairments due to physical or environmental limitations.  *Id* at 32.  A score of 50 or lower indicates "serious symptoms (e.g., suicidal ideation, severe obsession rituals, frequent shoplifting) or any serious impairment in social occupational or school functioning (e.g., no friends, inability to keep job)."  *Id* at 34.  A GAF of 51 through 60 is characterized by moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)).  *Id.*

back hurts, and rated the pain as 9 out of 10.  AR 628.  Temple's suicidal symptoms occurred in response to an argument he had with his family regarding his choice of a girlfriend.  AR 618.

Upon admission Temple's GAF score was 34.  *Id.*  The emergency department attending physician started him on Abilify as well as Carbamazepine.  *Id.*  His other medications were maintained, including Trazodone, Levothyroxine, Lisinopril, Lopid, Naprosyn, and Hydrocodone.  *Id.*  Shortly after admission, Steve Nitzsche ("Nitzsche"), LMHP, conducted a psychosocial assessment of Temple.  AR 636.  During the assessment Temple admitted to consuming three beers the previous night in an effort to fight off the voices.  AR 636.  Based upon a chart review, Nitzsche estimated Temple's IQ to be below average.  AR 638.  The assessment indicated that for the past four years Temple isolated himself in his room and usually did not associate with others.  *Id.*

The BryanLGH Medical Center discharged Temple on August 20, 2009, with a GAF score of 46.  AR 618.  At the time of discharge, the auditory hallucinations significantly decreased and Temple seemed alert and oriented.  *Id.*  The discharge diagnosis included severe major depressive disorder with psychotic features, alcoholism, history of prescription pain medication dependence and abuse, avoidant and antisocial personal disorder traits, chronic back pain, and hyperthyroidism.  AR 618, 621.  The final diagnosis ruled out schizoaffective disorder, bipolar type.  AR 618.

On August 27, 2009, during a follow-up to the August 18, 2009, hospitalization, Young found Temple to be calm and cooperative.  AR 645.  She stated that Temple's speech was logical, slow and soft.  AR 645.  Furthermore, Young did not identify any formal thought disorder.  *Id.*  On February 2, 2010, Young increased Temple's dosage

14

of Abilify to 10 mg a day and Trazodone to 200 mg daily.  AR 711.  During that visit, Temple reported that he secludes himself and the thought of going outside caused him some paranoia.  *Id*.  On March 11, 2010, Young advised Temple to discontinue the use of Abilify, because it provided minimal benefits and elevated Temple's triglyerides and cholesterol levels.  AR 710.

On March 17, 2010, Sanat K. Roy, M.D., D.F.A.P.A., an examining psychiatrist from the Community Mental Health Center of Lancaster County, conducted an Annual Psychiatric Diagnostic Review of Temple.  AR 708.  The exam did not show any evidence of fragmentation or flight of ideas.  *Id*.  The findings during the examination show Temple had superficial insight and his judgment seemed adequate to meet his basic human needs.  *Id*.  His GAF score was 65.  AR 709.  The report listed his current medication as: Effexor XR, Ablify, and Synthroid.  AR 709.  Dr. Roy recommended that Temple seek outpatient therapy.  AR 709.

During a routine medication check on June 21, 2010, Young found Temple cooperative, but his affect flattened and mood depressed.  AR 707.  Temple's living situation caused him anxiety and he struggled being around people.  *Id*.  Young recommended that Temple continue taking his current medication which included Trazodone, Tegretol, Efexor-XR, Lopid, Lisinopril, Hydrochlorothiazide and Hydrocodone.  *Id*.  Furthermore, his primary care physician had prescribed Chantix in order to help him quit smoking.  *Id*.

On September 8, 2010, due to Temple's increased anxiety, Young added a prescription of Hydroxyzine to Temple's psychiatric medications.  AR 788.  During a routine medication check on December 1, 2010, Young described Temple's anxiety and

depression as being under control, except when he is around large groups of people. AR 783.

### C. Residual Functional Capacity Assessments

On February 16, 2009, Christopher Milne, Ph.D. ("Dr. Milne"), a state disability determination services ("DDS") non-examining psychologist, provided a mental residual functional capacity assessment of Temple. AR 402. Dr. Milne found Temple not to be significantly limited in understanding and memory. AR 403. Dr. Milne found Temple to be moderately limited in some aspects of concentration and persistence. *Id.* In regards to social interactions, Dr. Milne found Temple to be moderately limited for the most part. AR 404. Dr. Milne noted that Temple is not significantly limited in his ability to respond and adapt to changes in the work setting. *Id.*

Dr. Milne also completed a psychiatric review technique form on March 10, 2009. AR 408. Dr. Milne indicated that Temple suffered from a social phobia disorder as well as alcohol abuse in remission. AR 413. Dr. Milne also found Temple to be mildly restricted in his daily activities, have moderate limitations in maintaining social functioning, and have moderate difficulties in maintaining concentration, persistence, or pace. AR 418. Furthermore, Dr. Milne indicated that Temple had one or two repeated episodes of decompensation, each of extended duration. *Id.* Dr. Milne did not find the evidence established the presence of the "C" criteria listing requirements. AR 419.

Overall, Dr. Milne observed that Temple's progress notes showed "variable problems with paranoid ideation, anxiety and depression, anger issues, and getting along with others at work." AR 420. Even though Dr. Milne found Temple's condition to be severe, he did not find it "consistent with any claim of marked psychological

limitations." *Id.*  Dr. Milne found Temple to have moderate limitations in the ability to deal with work routines and social contact; however, the limitations did not meet any of the criteria listed on the psychiatric review technique form.  *Id.*

On July 9, 2009, Glen Knosp, M.D. ("Dr. Knosp"), a DDS non-examining physician, provided a residual physical functional capacity assessment.  AR 557.  Dr. Knosp's diagnosis of Temple included spinal cervical fusion, a history of hypertension and hypothyroidism, as well as Graves' ophthalmopathy.  *Id.*  Dr. Knosp determined that Temple could occasionally lift 20 pounds and that he could frequently lift 10 pounds. AR 558.  Furthermore, Dr. Knosp checked a box on the assessment form indicating that Temple could stand and/or walk for approximately six hours in an eight-hour work-day. *Id.*  Dr. Knosp also determined that Temple could sit for a total of about six hours in an eight-hour work-day, and that he had an unlimited ability to push or pull.  *Id.*  Dr. Knosp attributed limitations in Temple's mobility to the cervical fusion.  AR *Id.*

Dr. Knosp did not find Temple to struggle with any postural limitations, manipulative limitations, visual limitations, nor any communicative limitations.  AR 559-561.  However, Dr. Knosp noted that Temple should avoid concentrated exposure to fumes, poor ventilation, and hazards such as machinery and heights due to his history of asthma.  AR 561.

On September 3, 2009, Jerry Reed, M.D. ("Dr. Reed"), a DSS non-examining physician, provided a physical residual functional capacity assessment.  AR 675.  Dr. Reed reviewed all of the evidence in the file and ultimately affirmed the residual physical functional capacity assessment from July 9, 2009.  *Id.*

On October 2, 2009, Glenda L.  Cottam, Ph.D., J.D. ("Dr. Cottam"), a non-examining DDS psychologist, conducted a mental residual functional capacity assessment.  AR 676.  Dr. Cottam determined only moderate limitations in Temple's ability to understand and remember detailed instructions; otherwise, his understanding and memory were not significantly limited.  *Id.*  In regards to Temple's ability to concentrate, Dr. Cottam indicated moderate limitation in the following categories:  the ability to carry out detailed instructions, ability to maintain attention and concentration for extended periods, ability to abide by a schedule, ability to work with others, and ability to complete a normal work-day and work-week without interruptions from psychologically based symptoms.  AR 677-78.  Furthermore, Dr. Cottam checked the boxes labeled "moderately limited" indicating Temple's limited ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with co-workers or peers without distracting them or exhibiting behavioral extremes.  AR 678.

Dr. Cottam also completed a psychiatric review technique on October 2, 2009.  AR 682.  Dr. Cottam indicated that Temple suffered from major depression or possibly schizoaffective disorder.  AR 685.  She additionally found Temple to exhibit anxiety and a possible personality disorder.  AR 687, 689.  Dr. Cottam noted a history of alcohol and prescription medication abuse or dependence.   AR 690.   In terms of functional limitations, Dr. Cottam found Temple mildly limited in daily activities; but moderately limited in ability to maintain social functioning and concentration.  AR 692.  Dr. Cottam noted Temple's two repeated episodes of decompensation; however, she did not find evidence to support an extended duration of the episodes.  *Id.*  Overall, Dr. Cottam did

not find the evidence established the presence of "C" criteria listing requirements. AR 694. She did not find Temple to be suffering from any marked mental health limitations. AR 695. Dr. Cottam stated that Temple appeared intelligent enough to handle simple instructions, had adequate social skills, and could garden and do odd jobs. *Id.*

### D.  Medical Impairment Evaluations

On July 20, 2010, Lisa Young, MSN, APRN, BC ("Young"), conducted a mental impairment evaluation and a mental capacities evaluation. AR 713-719. The evaluation period spanned from October 28, 2005, to the date of the evaluation. AR 713. On the mental impairment evaluation, Young noted that Temple suffered from moderate depression since the year 1999, and Temple experienced severe anxiety since 1999. *Id.* Young described Temple as having problems with concentration and memory, as well as anxiety and panic symptoms within public situations. Young indicated she saw improvement since she first started treating Temple. AR 714. However, she found Temple's prognosis somewhat guarded. *Id.* Young indicated that Temple's condition often interfered with his attention and concentration; however, she stated that Temple's impairments could be treated with ongoing medication management. *Id.* In regards to the mental capacities evaluation, Young requested that Temple visit vocational rehabilitation for an evaluation. AR 716.

Subsequent to the ALJ's hearing, Benjamin R. Gelber, M.D. ("Dr. Gelber"), completed a spinal physical capacity evaluation on March 21, 2011. AR 808. Temple submitted this additional evidence to the Appeals Council. Filing No. 12 at 17. The evaluation period spanned from January 20, 2009, until the date of the evaluation. *Id.* Dr. Gelber indicated that he treated Temple from July 25, 2007, until August 23, 2010.

*Id.* Dr. Gelber diagnosed Temple with a cervical disk extrusion at C6 on the left. *Id.* Temple's symptoms included neck pain and left shoulder and arm pain which ranged in severity from 9/10 to 10/10. *Id.* Dr. Gelber also indicated a presence of cervical foraminal compression on the left. AR 809. Dr. Gelber found Temple's pain severe enough to frequently interfere with his attention and concentration. *Id.* Overall, Dr. Gelber found Temple's prognosis to be poor and that the impairments could be expected to last at least twelve months. AR 809-810.

In terms of the functional limitations in a work situation, Dr. Gelber indicated that Temple constantly experienced pain and would need a job which permitted him to shift positions and sometimes lie down. AR 810-811. Temple could occasionally lift up to twenty pounds, but never fifty pounds. AR 811. Dr. Gelber also indicated that Temple is limited in tasks involving repetitive reaching, but can frequently bend and twist at the waist. AR 811-812.

Subsequent to the ALJ's hearing, Donna Lottman, A.P.R.N. ("Lottman"), completed a medical impairment evaluation and a physical capacities evaluation on March 22, 2011. AR 802, 805. Temple submitted this additional evidence to the Appeals Council. Filing No. 12 at 17. The evaluation period spanned from January 20, 2009, to the date of the evaluation. AR 802. Lottman noted a lack of improvement in Temple's condition since December 9, 2010, when she began providing care. AR 802, 803. She found that impairments regarding his C6-7 fusion would continue for at least twelve months. AR 802. Additionally, the impairments prevented Temple from engaging in the types of jobs he previously held and performing similar work could put stress on the hardware, fracturing and reinjuring the spine. *Id.* Lottman indicated that

lifting over twenty pounds, or doing overhead work would aggravate Temple's condition. AR 803.

On the physical capacities evaluation, Lottman indicated that Temple could handle a four- to six-hour work-day; but could not work more than three to four days a week. AR 805, 806. Within any given work-day, Temple could not sit, stand, or walk for more than four hours. AR 805. Temple could never lift or carry over 51 pounds, but could occasionally carry or lift up to 20 pounds. *Id.* Lottman did not find Temple to have any trouble using his hands or feet to conduct repetitive actions, such as grasping or reaching. *Id.* Lottman checked the boxes indicating that Temple could never reach above the shoulder level, work at unprotected heights or work around moving machinery. AR 806-807. Furthermore, Temple could seldom bend, crawl, or drive automotive equipment. *Id.* Lottman found Temple as seldom being able to perform at a rapid pace and frequently needing to perform at a slower pace. AR 806. Additionally, Temple would need to take breaks to walk around every two to four hours. *Id.*

### E.  ALJ's Findings

The ALJ found Temple not disabled under § 1614(A)(3)(A) of the Social Security Act, since January 20, 2009. Based on the medical evidence, the ALJ found that Temple has back pain, status post cervical discectomy and fusion at C6-7; Graves' disease, status post thyroidectomy in 2007; hypothyroidism; history of hypertension; mental anxiety; depression; and substance use disorder. AR 11. The ALJ further noted Temple's impairments are "severe" within the meaning of the regulations, but that Temple did not have an impairment or combination of impairments listed in, or medically equal to, one listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R.

416.920(d), 416.925 and 416.936).   *Id.*   The ALJ specifically considered the requirements for musculoskeletal and cardiovascular impairments, and determined that Temple's back and neck pain did not meet the requisite listing-level severity.   *Id.*   The ALJ referenced Temple's hypothyroidism, but did not find it to impose listing-level impairments on any other body system, including eye function.   AR 12.

Furthermore, the ALJ considered Temple's mental impairments, specifically whether they meet the criteria of listings 12.04, 12.06, and 12.09.   *Id.*   The ALJ found Temple to have mild restrictions within his daily activities; moderate difficulties in social functioning and the area of concentration, persistence, and pace; and a lack of repeated episodes of decompensation of extended duration.   *Id.*   The ALJ determined that Temple's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration; thus the "paragraph B" criteria, of the adult mental disorder listings in 12.00 of the Listing of Impairments, were not satisfied.   *Id.*   The ALJ also looked at "paragraph C" criteria, but did not find sufficient evidence to meet this criteria.   *Id.*

The ALJ accorded great weight to DDS psychologist, Dr. Cottam, who reviewed Temple's medical history and concluded the record failed to support marked mental health limitations.   AR 13.   Thus, the ALJ found that Temple could work.   *Id.*   The ALJ noted Temple received a GAF rating of 65, concluding that Temple experienced mild symptoms but was generally functioning pretty well.   AR 14.

Following review of the entire record, the ALJ found Temple to have a residual functional capacity to perform light work as defined in 20 C.F.R. 416.967(b).   The ALJ noted that Temple could lift or carry twenty pounds occasionally and ten pounds

frequently.  13.  Temple could stand, sit, or walk for six out of eight hours, and he could occasionally climb, balance, stoop, kneel, crouch, and crawl.  *Id.*  The ALJ also noted that Temple needed to avoid more than occasional work over shoulder level as well as concentrated exposure to fumes and hazards.  *Id.*

The ALJ questioned the credibility of Temple's allegations.  AR 14.  The ALJ found Temple's allegations undermined by his poor work history, specifically the fact that Temple did not earn more than $4,000 in any given year.  *Id.*  Furthermore, based on Dr. Roy's suspicion that Temple might still be using alcohol, the ALJ felt that Temple minimized his alcohol abuse.  AR 14.  The ALJ noted that Young found Temple's prognosis somewhat guarded and that his mental impairments often interfered with concentration and attention.  *Id.*  Young referred Temple to vocational rehabilitation for an evaluation; however, Temple only attended one appointment and missed several others.  *Id.*  Temple's attorney informed the ALJ that Vocational Rehabilitation Services advised Temple, but could not help him.  *Id.*  Due to the lack of further explanation by the attorney, the ALJ did not give great weight to the statement.  *Id.*  The ALJ noted the records from vocational rehabilitation stated that Temple's daily activities included time on the computer, watching television, and reading the newspaper.  *Id.*

Based on these determinations and Temple's RFC, the ALJ evaluated whether Temple could perform any past relevant work.  AR 16.  Temple's previous jobs included lifting or carrying 50 to 100 or more pounds and current limitations restricted him to lifting or carrying up to 20 pounds.  *Id.*  Thus, the ALJ opined that Temple could not perform past relevant work.  *Id.*  Subsequently, the ALJ analyzed whether other jobs in

significant number in the national economy existed which Temple could perform, consistent with his RFC, education, work experience, and age. *Id.*

The ALJ relied on the testimony of the vocational expert in concluding that other work existed in significant number in the national economy into which Temple was capable of making a successful transition. AR 17. The vocational expert identified the following occupations, in the Dictionary of Occupational Titles, as possible jobs for Temple: inserting machine operator, shipping/receiving weigher, inspector/packager, final assembler, inspector/tester, and packager. *Id.* The vocational expert further indicated that based on Temple's RFC, his occupational base would include approximately 40% to 50% of all unskilled, light jobs and approximately 35% to 40% of all unskilled, sedentary jobs. *Id.*

Ms. Anita Howell testified as the vocational expert during the March 9, 2011, hearing in front of the ALJ. AR 60. The ALJ adopted Howell's testimony that if Temple assumed the hypothetical individual's work restrictions as proposed in the initial hypothetical presented by the ALJ, then Temple would be capable of making a vocational adjustment to other work. AR 64. The ALJ rejected the hypothetical question posed by Temple's attorney, which included reference to Temple's limitations in his ability to understand and concentrate, as not supported by the record. AR 66-67. Furthermore, Temple's attorney proposed a hypothetical with a GAF score below 50 basing it off of the GAF scores that Temple received upon being released from the hospital; whereas, the ALJ proffered a GAF score of 65. AR 70. Ms. Howell testified that a GAF score below 50 would mean that the hypothetical individual is likely unable to work; whereas, a sore of 65 would not rule out employment. *Id.* Accordingly, the ALJ

determined that Temple retains the capacity for work that exists in significant numbers in the national economy, and that Temple is not "disabled within the meaning of the Act." AR 18.  The ALJ adopted Howell's findings that there are a number of jobs in the national economy that Temple can perform.  AR 17.

### F.  Plaintiff's Objections to the ALJ's Findings

Temple appeals the ALJ's findings, arguing that the ALJ failed to evaluate the medical opinions of Ms. Young, Dr. Gelber, and Ms. Lottman.   Filing No. 12. Furthermore, Temple argues that the ALJ failed to properly evaluate the presence of peripheral vascular disease, and failed to fully and fairly develop the medical evidence by failing to obtain work-related mental limitations from a treating or examining medical source.  *Id.*  Specifically, Temple argues that the ALJ neglected to take fully into account Ms. Young's opinions regarding Temple's mental limitations, and Dr. Gelber's and Ms. Lottman's opinions regarding Temple's physical limitations.  *Id.*

In response, the SSA argues that the ALJ did take Ms. Young's opinion into account.  Filing No. 19.  The SSA specifically argues that in her decision the ALJ relied upon Ms. Young's opinion as to Temple's mental limitations in terms of anxiety, concentration, and memory.  *Id.*  The SSA further notes that Temple cannot point to any particular medical record which justified greater limitations than the ones the ALJ assigned.  *Id.*  Additionally, the SSA claims that Temple's hypothetical question was confusing because it recited medical findings and conclusions but did not translate them into work-related limitations.  *Id.*  In regards to allegations of the presence of peripheral vascular disease, the SSA maintains that the record does not include any evidence supporting that the condition would impose any functional limitations.  *Id.*

25

## II.  STANDARD OF REVIEW

When reviewing the decision not to award disability benefits, the district court does not reweigh evidence or the credibility of witnesses or revisit issues *de novo*. *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995).  Rather, the court must review the Commissioner's decision in order to determine "whether there is substantial evidence based on the entire record to support he ALJ's factual findings." *Johnson v. Chater*, 108 F.3d 178, 179 (8th Cir. 1997) (quoting *Clark v. Chater*, 75 F.3d 414, 416 (8th Cir. 1996)).  Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (citations and internal quotation marks omitted).

A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010).  Nevertheless, the court's review "is more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp' of the Commissioner's action." *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008) (citations, brackets, and internal quotation marks omitted).  *See also Finch*, 547 F.3d at 935 (explaining that the court must consider evidence that detracts from the Commissioner's decision in addition to evidence that supports it).

The court must also determine whether the Commissioner's decision "is based on legal error." *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000).  The court does not owe deference to the Commissioner's legal conclusions.  *See Juszczyk v. Astrue*, 542

F.3d 626, 633 (8th Cir. 2008); *Brueggemann v. Barnhart*, 348 F.3d 689, 692 (8th Cir. 2003).  Error exists when an ALJ fails to consider or discuss a treating physician's opinion that a claimant is disabled when the record contains no contradictory medical opinion.  *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).  "[A] treating physician's opinion regarding an applicant's impairment will be granted 'controlling weight,' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'" *Prosch v. Apfel*, 201 F.3d 1010, 1012-13 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527(d)(2) (2006).  "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions."  *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).

### III.  LAW

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505; 20 C.F.R. § 416.905(a).  A claimant is disabled when the claimant is "not only unable to do his previous work but cannot, considering . . . his age, education and work experience, engage in any other kind of substantial gainful work which exists in [significant numbers in] the national economy . . . either in the region in which such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

An ALJ evaluates a disability claim according to a five-step sequential analysis prescribed by Social Security regulations.  See 20 C.F.R. §§ 404.1520(a), 416.920(a). More specifically, the ALJ must determine:  "(1) whether the claimant is engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals  an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) whether the claimant can return to [his] past relevant work; and (5) whether the claimant can adjust to other work in the national economy."  *Tilley v. Astrue*, 580 F.3d 675, 678 (8th Cir. 2009); *see also Kluesner v. Astrue*, 607 F.3d 533, 536-37 (8th Cir. 2010).  "Through step four of this analysis, the claimant has the burden of showing that [he] is disabled."  *Steed v. Astrue*, 524 F.3d 872, 874 (8th Cir. 2008).  After the analysis reaches step five, however, "the burden shift[s] to the Commissioner to show that there are other jobs in the economy that [the] claimant can perform."  *Id.*  The Commissioner needs to prove, first, that the claimant retains the residual functional capacity to perform other kinds of work, and second, that other such work exists in substantial numbers in the national economy.  *See Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).  A claimant's residual functional capacity is a medical question.  See *id.* at 858.

## IV.  DISCUSSION

Upon careful review of the record, the parties' briefs, and the law, the court concludes that the ALJ's decision denying benefits is not supported by substantial evidence on the record as a whole.  Specifically, the ALJ erred when she concluded that Temple would be able to sustain employment.

As noted above, in this case the ALJ reached step five of the sequential analysis and determined that because Temple could adjust to other work in the national economy, he was not disabled.  AR 17.  Temple seeks an order reversing this decision because (a) the ALJ improperly discounted the opinions of Ms. Young, and other treating and consulting medical providers; (b) the Appeals Council neglected to evaluate the opinions of Dr. Gelber and Ms. Lottman; (c) the ALJ did not properly evaluate Temple's peripheral vascular disease; and (d) the ALJ erred by failing to obtain evidence on work-related limitations from a treating or examining medical source.  Filing No. 12.

## A.  Treating Physicians

The plaintiff argues that by relying on evidence from non-examining medical sources and rejecting the opinions of Dr. Gelber, Ms. Young and Ms. Lottman, the ALJ failed to fully and fairly develop the medical evidence.  Filing No. 12 at 22.  Error exists when an ALJ fails to consider or discuss a treating physician's opinion that a claimant is disabled when the record contains no contradictory medical opinion.  *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).  "[A] treating physician's opinion regarding an applicant's impairment will be granted 'controlling weight,' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'"  *Prosch v. Apfel*, 201 F.3d 1010, 1012-1013 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527(d)(2) (2006)).

The ALJ may discount or disregard such a treating physician's opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions.  *Hogan v. Apfel*, 239 F.3d at 961.  By

contrast, "[t]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998); *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000) (holding that it was improper for an ALJ to rely on the opinions of reviewing physicians alone).

The ALJ also needs to take into account the opinions of "other" sources. *Shontos v. Barnhart*, 328 F3d 418, 426 (8th Cir. 2003), citing 20 C.F.R. § 404.1513(d)(1).   These sources can include nurse-practitioners, physicians' assistants, therapists, and chiropractors.  20 C.F.R. § 404.1513(d)(1).  Furthermore, "[t]he amount of weight given to a medical opinion is to be governed by a number of factors including the examining relationship, the treatment relationship, consistency, specialization, and other factors." *Shontos v. Barnahrt*, 328 F3d 418, 426 (8th Cir. 2003), 20 C.F.R. § 404.1527(c).  Generally more weight is given to treating source, because they can provide a more detailed picture of the claimant's medical impairments.  20 C.F.R. § 404.1527(c)(2).  Additionally, the length of treatment, extent of treatment, and the frequency of examinations will be used to determine the weight given to a treating source.   20 C.F.R. § 404.1527(c)(2)(i-ii).  The longer and more involved the relationship between the claimant and treating source is, the more weight will be given to it.  *Id.*

In the case at hand, the ALJ failed to fully discuss the treating physician's opinions as well as the opinions of the other medical providers that worked closely with Temple.  At the time of the ALJ's hearing, the record included progress notes from Dr. Gelber, Young, and Lottman, as well as Graham.  Additionally, the record included

30

extensive medical reports from a variety of other providers that had afforded treatment to Temple.

Dr. Gelber provided extensive treatment for Temple, including performing Temple's anterior cervical discectomy.   AR 593.   As a treating physician, whose opinions are consistent with substantial evidence on the record, Dr. Gelber's opinions should have received controlling weight.  Temple saw Young on a regular basis since October 25, 2001.  AR 713.  Young is an APRN and as such fits the category of "other" sources which the ALJ needs to take into account.   Since Young had a long-term treatment relationship with Temple, her opinions are deserving of greater weight. Young is one of the only treating sources that continuously had contact with Temple; thus, she can provide a detailed picture of Temple's mental health ailments.

Lottman, also an APRN, provided treatment to Temple on a number of occasions.   However, she did not have a long-term established relationship with Temple, since she started treating Temple on December 9, 2010.  AR 802, 803.  Thus, her opinions do not deserve as much weight as Young's.   Nevertheless, Graham, a PAC, treated Temple frequently for his back pain and chest pain.  The records indicate Graham provided treatment and recommendations on an ongoing basis from early 2009 until the present.   Graham frequently examined Temple and provided extensive treatment, which would indicate a greater weight should be given to her opinions.

All of the above mentioned opinions were available to the ALJ and should have been given proper weight.  The ALJ erred by not giving proper weight to these opinions and giving undue weight to the non-treating consulting opinions.

31

**B.  Evidence Submitted to the Vocational Expert**

To assist an ALJ making a disability determination, a vocational expert ("VE") is many times asked a hypothetical question to help the ALJ determine whether a sufficient number of jobs exists in the national economy that can be performed by a person with a similar RFC to the claimant.  Within these possible jobs "[t]he evidence must show the claimant has 'the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real word'"; otherwise, the claimant is unable to work.  *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (quoting *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc), abrogated on other grounds, *Forney v. Apfel*, 524 U.S. 266 (1998)).

A hypothetical question is properly formulated if it incorporates impairments "supported by substantial evidence in the record and accepted as true by the ALJ." *Guilliams v. Barnhart*, 393 F.3d 798, 804 (8th Cir. 2005) (quoting *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001)).   "[A] vocational expert's responses to hypothetical questions posed by an ALJ constitutes substantial evidence only where such questions precisely set forth all of the claimant's physical and mental impairments*." Wagoner v. Bowen*, 646 F. Supp. 1258, 1264 (W.D. Mo. 1986) (citing *McMillian v. Schweiker*, 697 F.2d 215, 221 (8th Cir.1983)).

A hypothetical question posed to a vocational expert as part of the RFC determination must precisely set out all the claimant's impairments that are supported by the evidence.  *Pickney v. Charter*, 96 F.3d 294, 297 (8th Cir. 1996).  The hypothetical question must capture the concrete consequences of a claimant's deficiencies.  *Id.*

32

Testimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the Secretary's decision. *Id* at 296.

Courts apply a harmless error analysis during judicial review of administrative decisions that are in part based on hypothetical questions. For judicial review of the denial of Social Security benefits, an error is harmless when the outcome of the case would be unchanged even if the error had not occurred. *See Brueggemann v. Barnhart*, 348 F.3d 689, 695 (8th Cir. 2003). Because a VE's testimony may be considered substantial evidence "only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies," *Taylor v. Chater*, 118 F.3d 1274, 1278 (8th Cir. 1997) (citing *Porch v. Chater*, 115 F.3d 567, 572-73 (8th Cir. 1997), and *Pickney v. Chater*, 96 F.3d 294, 297 (8th Cir. 1996)), the court finds that the VE's testimony on which the ALJ relied was not substantial evidence.

Temple contends that the ALJ failed to take into account the hypothetical presented to the VE which included reference to Temple's limitations in regards to his depression and anxiety as determined by Young. Filing No. 12 at 15. The ALJ summarized Young's findings and indicated that her opinions were entitled to weight and found them consistent with other substantial evidence of record; however, the ALJ did not specify how much weight was given to Young's opinion. AR 15-16.

Ms. Anita Howell, testified as the vocational expert during the March 9, 2011, hearing in front of the ALJ. AR 60. The ALJ asked her to assume that the work should be unskilled, routine and repetitive and should not require extended concentration or

attention.   AR 62.   Furthermore, the work should only involve occasional social interaction with others such as co-workers, supervisors or the general public. *Id.* The VE then testified to jobs such as inserting machine operator, shipping, receiving weigher, and inspector packager.   AR 62.   The ALJ then asked the VE to specify sedentary jobs which Temple could perform; these included final assembler, inspector tester, and sedentary packager.  AR 62-63.

However, when plaintiff asked the VE to take the ALJ's hypothetical in its entirety and add to it the limitations posed by Dr. Cottam,[3] the VE testified that the plaintiff could very well be hired but would not likely be able to sustain employment.   AR 65. Furthermore, when the plaintiff asked the VE to additionally consider moderate to severe depression and severe anxiety on an ongoing basis as identified by Young, the VE's testimony remained the same.   AR 65-66.   When asked to consider Temple's testimony in addition to the previous hypothetical, the VE again stated that it would be difficult for the plaintiff to sustain gainful employment.  AR 66.

Subsequently, the ALJ posed a hypothetical based on the narrative provided by Dr. Cottam.   The ALJ asked the VE to consider someone that could handle simple instructions, appeared to have adequate social skills, and had no indications supporting a market mental health limitation.  AR 66-67.  The VE responded that the plaintiff could conduct the previously identified unskilled jobs, and that according to the specific narrative those activities could be sustained.   AR 67.   However, upon reexamination,

---

[3] On October 2, 2009, Dr. Glenda L. Cottam, Ph.D., J.D., a non-examining DDS psychologist, conducted a mental residual functional capacity assessment.  AR 676.  Cottam determined that Temple was moderately limited in his ability to: carry out detailed instructions; maintain attention and concentrate for extended period; abide by a schedule; work with others; complete a normal work-day and work-week; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors, and get along with co-workers or peers without distracting them or exhibiting extreme behavior without interruptions from psychologically based symptoms.  AR 677-678.

the VE indicated that Dr. Cottam's narrative did not account for Temple's ability to maintain a job, and it was her opinion that Temple would have difficulty sustaining activities.  AR 67.  Furthermore, the VE noted that she found Dr. Cottam's narrative inconsistent with the number of moderate markings on the RCF, indicating that the number of moderate markings would suggest an individual that might be able to obtain a job but would not be able to sustain activity.  AR 68.

Additionally, the VE testified that when Temple's GAF scores of 50 and 46[4] are added to the ALJ's hypothetical, it would indicate that Temple would have difficulty obtaining a job and would struggle keeping such a job.  AR 70.  Subsequently, the ALJ asked the VE what a GAF score of 65 would mean.  *Id.*  The VE responded that a score of 65 would not rule out employment, but did not comment on how well such an individual could sustain a job.  *Id.*

The hypothetical questions posed to the VE contained limitations as defined by Dr. Cottam as well as the plaintiff's treating psychiatric nurse.  Throughout the various hypotheticals, the VE discussed the presence of a significant number of jobs in the national economy which the plaintiff would be able to obtain but that such a person would have difficulty sustaining employment.  The ALJ did not take the VE's testimony regarding the plaintiff's ability to maintain employment into account.  Instead the ALJ solely relied on the VE's testimony that a significant number of jobs existed in the national economy which the plaintiff could perform based on his RCF.

The ALJ erred in disregarding the VE's responses to the hypotheticals which postured that plaintiff's condition prevented him from maintaining employment even in

---

[4] On March 29, 2009, Temple was discharged from the hospital with a GAF score of 50.  On August 20, 2009, Temple was discharged from the hospital with a GAF score of 46.  AR 69.

the types of jobs originally described by the VE.  Substantial evidence on the record, including plaintiff's poor work history, is aligned with the VE's testimony that the plaintiff would not be able to maintain employment.  Therefore, the court finds that the ALJ substituted her opinion for that of Dr. Cottam, Dr. Gelber, Dr. Roy, and Ms. Young.  The hypotheticals including the mental impairments which indicate that Temple would not be able to sustain a job should have been more thoroughly considered by the ALJ.  Accordingly, the hypotheticals on which the ALJ relied are not substantial evidence so as to support the determination by the ALJ.

### C.  Opinions of Dr. Gelber and Ms. Lottman

Temple contends that the Appeals Council failed to consider the new evidence containing Dr. Gelber's and Lottman's opinions.  Filing No. 12 at 17.  Temple argues that the new evidence submitted to the Appeals Council became part of the administrative record and should have been considered by the Appeals Council, citing *Nelson v. Sullivan*, 966 F.2d 363, 366 (8th Cir. 1992).

In a Social Security benefits case, the Appeals Council must consider evidence submitted with a request for review if it is (a) new, (b) material, and (c) related to the period on or before the date of the ALJ's decision.  20 C.F.R. § 404.970(b); see *Whitney v. Astrue*, 668 F.3d 1004, 1006 (8th Cir. 2012) citing *Williams v. Sullivan*, 905 F.2d 214, 216 (8th Cir.1990).  The evidence will be considered new if it is "more than merely cumulative of other evidence in the record."  *Bergmann v. Apfel*, 207 F.3d 1065, 1069 (8th Cir. 2000).  Furthermore, the evidence is material when it "relates to the claimant's condition for the time period for which benefits were denied, and not to after-acquired

conditions or post-decision deterioration of a pre-existing condition." *Eidoen v. Apfel*, 221 F.3d 1342 (8th Cir. 2000); see *Bergmann*, 207 F.3d at 1069-70.

Once it becomes evident that the Appeals Council took the newly submitted evidence into consideration, the role of the reviewing court "is limited to deciding whether the administrative law judge's determination is supported by substantial evidence on the record as a whole, including the new evidence submitted after the determination was made." *Riley v. Shalala*, 18 F.3d 619, 622 (8th Cir. 1994); *see* *Nelson*, 966 F.2d at 366, *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir.1992); *O'Donnell v. Barnhart*, 318 F.3d 811, 816 (8th Cir. 2003). "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's decision." *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir.2000). In order to evaluate the new evidence the reviewing court needs to "determine how the ALJ would have weighted the newly submitted evidence if it had been presented at the original hearing." *Jenkins v. Apfel*, 196 F.3d 922, 924 (8th Cir. 1999); see *Riley v. Shalala*, 18 F.3d 619, 622 (8th Cir.1994). If the reviewing court finds that the ALJ's decision is supported by the record as a whole, including the new evidence, then the ALJ's final decision remains.

The additional evidence in question in the case at hand is the spinal physical capacity evaluation completed by Dr. Gelber on March 21, 2011, and the medical impairment evaluation and physical capacities evaluation completed by Lottman on March 22, 2011. AR 802, 805, 808. The plaintiff argues that these additional evaluations provided limitations which are materially different from the ALJ's findings regarding Temple's RFC. Filing No. 12 at 18.

37

The ALJ specifically found that Temple could "lift or carry 20 pounds occasionally and 10 pounds frequently; stand, sit, or walk for 6 out of 8 hours; occasionally climb, balance, stoop, kneel, crouch, and crawl; avoid more than occasional work over shoulder level; avoid concentrated exposure to fumes and hazards." AR 13. In terms of Temple's mental limitations, the ALJ found that the plaintiff would be constrained to "unskilled, routine, repetitive work that would not require extended attention or concentration." *Id.* Furthermore, the ALJ stated that Temple would be "limited to jobs with brief superficial, occasional interaction with co-workers, supervisors, or the general public." *Id.*

Dr. Gelber evaluated Temple's pain as severe enough to frequently interfere with his attention and concentration. AR 808. Dr. Gelber further indicated that Temple needed a job which would permit him to shift positions and lie down sometimes. AR 810-811. Dr. Gelber also concluded that Temple could occasionally lift up to twenty pounds, but never fifty pounds. AR 811. However, Dr. Gelber could not specify the amount of time Temple could sit or stand, how many hours in day he would work, or how many days in a week he could work. AR 810, 812.

Lottman's evaluation stated that Temple could work for four to six hours in a day, but could not work more than three to four days in a week and would need to take breaks to walk around every two to four hours. AR 805-806. Furthermore, Temple could not sit, stand, or walk for more than four hours at a time. AR 805. Additionally, Lottman found that lifting over twenty pounds or doing overhead work could aggravate Temple's condition. AR 803. Lottman also indicated that Temple could seldom bend, crawl, or drive automotive equipment. AR 806-807.

The plaintiff argues that the ALJ's findings are not consistent with the evaluations of Dr. Gelber and Lottman because they do not take into account Temple's need to alternate positions, need for frequent breaks, and present a discrepancy in the total number of hours Temple can work in a day or a week.  Filing No. 12 at 19.  In its denial of review, the Appeals Council noted that it had reviewed the new evidence, but did not find it necessary to review the decision of the ALJ.  AR 1,4.

When "the Appeals Council considers the new evidence but declines to review the case, we review the ALJ's decision and determine whether there is substantial evidence in the administrative record, which now includes the new evidence, to support he ALJ's decision."  *Nelson v. Sullivan*, 966 F.2d 363, 366 (8th Cir. 1992), citing *Browning v. Sullivan*, 958 F.2d 817, 823 (8th Cir. 1992).  The overall evidence suggests that Temple would have difficulty maintaining his physical and mental faculties consistently throughout an eight-hour work-day for five days a week.  This is contrary to the ALJ's finding of Temple's ability to maintain employment; therefore, the ALJ's ruling is not supported by the record as a whole.

### D.  Peripheral Vascular Disease

Temple contends that the ALJ failed to properly evaluate his peripheral vascular disease.  Fling No. 12 at 19.  The record includes evaluations by Dr. Robert Hibbard which indicate that Temple has abnormal ankle-brachial indices.  AR 512.  However, the plaintiff did not bring up this particular ailment during his hearing before the ALJ and no further evidence was presented.  Nevertheless, the ALJ addressed the issue in his decision, stating that Temple's "cardiovascular impairment is not associated with chronic heart failure; ischemic heart disease; recurrent arrhythmia; congenital heart

disease; vacuolar heart disease; cardiomyopathy; aneurysm; chronic venous insufficiency; or peripheral arterial disease of listing-level severity." AR 11. Thus, the ALJ discussed the issue to some extent, and the court need not address it further, as there is sufficient evidence in the record to support a finding of disability.

## CONCLUSION

Because the record presented to the ALJ contains substantial evidence supporting a finding of disability, the court may reverse the case for entry of an order granting benefits to the claimant. *Parsons v. Heckler*, 739 F.2d 1334, 1341 (8th Cir. 1984). Where the record overwhelmingly supports a disability finding and remand would merely delay the receipt of benefits to which plaintiff is entitled, reversal is appropriate. *Thompson v. Sullivan*, 957 F.2d 611, 614 (8th Cir. 1992). In this case, the substantial evidence supporting a finding of disability is overwhelming. Under the circumstances, further hearings would merely delay benefits; accordingly, an order granting benefits is appropriate. *Id.*

IT IS ORDERED:

1.      The decision of the Commissioner is reversed;

2.      Plaintiff's appeal is granted;

3.      This case is remanded to the Commissioner with directions to award the plaintiff benefits; and

        4.      A separate Judgment will be issued in conjunction with this Memorandum

and Order.

        DATED this 22nd day of April, 2013.

                                BY THE COURT:


                                s/ Joseph F. Bataillon                         
                                U.S. District Court Judge